Mr. Bullock. Thank you, Your Honor. Good morning and may it please the Court, I'm Alex Bullock appearing on behalf of Kyle Gramling. Seated at the table with me is my colleague Stuart Freed. If the Court please, this case is an attempt by the government to erect barriers to prevent Kyle Gramling and other injured members of the armed forces from receiving the full benefits to which he and they are entitled for being injured while serving their country. Mr. Gramling is asking this Court to remand the matter to the Court of Federal Claims for a complete hearing on the merits of the case. But he was injured during training, not during armed conflict. That's correct, Your Honor. Doesn't that decide the case? The question is the extent to which the definition of armed combat has, can be, is expanded and what the issue of congressional intent was under the statute that these regulations are intended. It's our contention that upon remand, that's an issue that could be, that should be addressed by the Court of Federal Claims. The, in order to achieve the goal of getting Mr. Gramling should establish that he did not waive his right to challenge the DTM, the directive type memorandum, which is the regulation at issue in this case, in the Court of Federal Claims and that there are substantive grounds upon which to challenge the validity of the DTM. The government takes the position that Mr. Gramling should have challenged the in the Army and discharged. The government's argument is cloaked in the language of whether he should have appealed the finding of the Physical Evaluation Board on a particular form, the direct, uh, the form, uh, under which, that the, uh, P.E.B. has to fill out in order to determine, uh, the level of his disability and under what circumstances he was disabled. The issue in this case is really not whether the P.E.B. made the correct decision as referred to in Section 10 of the, of the particular form and whether or not the block that they checked or the box that they checked was correct or not. The government takes the position that at that stage, Mr. Gramling was required to also inform the P.E.B. that he intended to challenge the validity of the DTM. For a brief history, and I know that we've covered this. How do, even if you, let's assume for a moment the utility doctrine, the futility doctrine gets you by waiver, how do you deal with the direct armed conflict problem? We are, at first, the issue is the DTM had issued a regulation and the issue has a six-month lifespan. The, uh, at the end of that six months, the Army, the Secretary of Defense, uh, is required to take an affirmative step to either reissue, uh, that DTM or incorporate it into, uh, another regulation. The government takes . . . But even if that regulation was not in place, uh, there would, there would be no basis then to contend that there was, uh, a recovery of enhanced disability. Well, Your Honor, the, the, the, the, the basis still remains statutory. What would happen, it would be the, the equivalent of a regulation being invalidated but the, but the, uh, Department of Defense, uh, the Secretary of Defense is still required under that statute to come up with a proper regulation. So, they would be required to have to go back and reissue a DTM or reissue some other type of equivalent, uh, regulation because there would, as you are correct, there would be a void but there is still the statutory responsibility to fill that void. But doesn't the statute give the, the Secretary of Defense wide discretion here to tell us what the statute means? It would be wide discretion. It is not unfettered discretion. Um, and given the . . . Well, Your Honor, there are a number of circumstances under which, uh, there are clear definitions of, uh, various versions of what combat-related means. There is, uh, and the particular definition in this issue, um, is we would contend that to the, to the extent that it exists, we would contend that it is, it's not only inconsistent with these other definitions but it's also inconsistent with, uh, other definitions in the form and it's also inconsistent with congressional intent. How is it inconsistent with congressional intent? There's evidence in the, in the record that Congress intended the, to be expanded to not only actual combat but also in combat-related areas such as, uh, injured in a combat zone, injured by an instrumentality . . . The . . . Well, I think when you look at the statute and it goes back to instrumentality, injured by instrumentalities of war, uh, this is an instrumentality. He was injured jumping out of a helicopter, uh, in training. That's an instrumentality of war. The, the, at some point in time, the question, the initial question becomes whether or not this was, this regulation was in force and effect. And then it goes back to the Secretary to determine, uh, um, it's our contention that as of now, there is nothing in force and effect. But you said that there's congressional intent. Where do you find congressional intent? I read your brief. You have a letter from a congressman. That's not 535 members of Congress. You've got, uh, a letter from a few other members of Congress. Where do you find congressional intent? Well, uh, Your Honor, I, I think that, I wish that the statute was written a little more clearly, uh, but it, and it does give broad discretion. But I believe there is some evidence of, uh, intent on how to focus, uh, that particular issue. Um, and I would, I would defer to what, as Your Honor pointed out in the brief, uh, what we had stated in terms of the issue that, uh, a number of members of Congress had said this was the clear intention. Uh, I worked up there about 20 years. When we wrote a letter, we knew that's because we hadn't won the legislation and we were trying to get it some other way. Isn't the Your Honor, I'm not, I would certainly defer to your practical knowledge. I could never get anybody on the Hill to hire me. But the reality is that, uh, what we're left with is what's in the record. And I'm not aware of any court decision that also says if a member of Congress writes a letter, that's because they've lost. Um, the, uh, the reality is that... I'm trying to ask you to, how can we possibly go around the Department of Defense regulations when Congress seems to have delegated to them the authority to decide what combat related means? Well, I, in this instance, Your Honor, I don't believe we're asking this court to go around and rewrite, uh, the DTM or rewrite the regulation. There is, there is no regulation in effect at this time. If you go through the government's brief, they list all these things that they contend, uh, they're dancing around the head of a pin in terms of whether or not it's reissued, but they can never point to anything that says it's reissued. But we're just asking the, uh, this court to remand to the Court of Federal Claims to determine whether or not there's a waiver. Um, and that decision has broad implications not only for Mr. Grambling but for other people bringing these claims, but also whether or not, uh, the, the regulation is in effect and then direct the Secretary to reissue properly under its own rules, uh, another regulation. To that point, the, uh, government's argued that, uh, what was reissued, that somehow this particular DTM was reissued in October of 2008. However, the particular document that issued doesn't reference reissuing that DTM in any way. Um, it says on the face of it, it's merely, it's guidance. It references the DTM even though the DTM had already expired, um, and there's nothing as you dig into the document that relates to, uh, a particular, uh, that relates in any way to saying we are therefore reissuing, uh, that particular document. The only reference that could be anywhere near that would be that the General Counsel of the Department of Defense can provide overall legal counsel to, during the physical disability evaluation process, but nothing in this document reissues. They, they can't really have it both ways and they can, you know, by saying, you know, the regulation requires it to be Moreover, the, the position and the decision of the Court of Federal Accounts below regarding waiver is a critical issue not only to, uh, Mr. Gramling, but across the board. To say that a board such as the PEB, which is made up of two officers and a medical officer, uh, is then the proper venue to challenge an underlying regulation is in and of itself, um, an extension that should not be allowed to stand because there's nothing in the jurisdiction of the PEB that in any way would qualify it to be able to address whether or not validity of the regulation under which it's operating, uh, could stand. What, what is it in the statute that you contend renders the regulation invalid? Uh, I, just so I understand the question, you are moving beyond whether or not it's in, the regulation's in force in effect. Yeah, assuming the regulation's in effect. Yeah. It's, it's our contention that the, the intent was to expand and, and I think they did expand beyond merely someone injured in Iraq in the middle of, in combat. But the statute explicitly gives discretion to the secretary. That's correct, Your Honor. It, and the question is Doesn't that, doesn't that really undercut your argument? Well, if you, for example, The secretary either has the discretion within the broad umbrella of the statute or he doesn't. If he has discretion, then he's free, is he not, to issue a regulation that may encompass what he believes is a subset of whatever broader umbrella might be set forth in this statute. Uh, I would agree with you, Your Honor, that he does have broad discretion. It's our contention that by, uh, in the way that the, uh, DTM is, it's not the DTM, excuse me, but in the way that the, uh, definition of combat related, uh, and then instrumentality of war, the layers that is set down when this is broken down by category is, is so far to the end of the abuse of discretion and what is combat related or injured by an instrumentality of war that that becomes an abuse, arbitrary and capricious abuse of discretion. Okay. We do not have to, however, to reach that if there is no regulation in effect at this time. Thank you, Your Honor. I'll reserve the balance of my time. Thank you, Mr. Bullock. Mr. Yates. May it please the Court. My name is Greg Yates. I'm here on behalf of the United States. Uh, with me is my, uh, co-counsel, Major Jennifer Brewer of the United States Army. Uh, the trial court below correctly dismissed Mr. Gramling's suit and entered judgment upon the administrative record. Uh, Mr. Gramling waived his right to seek enhanced disability severance payments, uh, before the courts by failing to raise this issue in front of the administrative, uh, boards of the Army. Also, Mr. Gramling does not qualify in any event for enhanced disability severance payments, uh, because he did not sustain his injuries, uh, during the performance of combat-related operations or as a direct result of armed conflict. I'll take these two issues one at a time. Uh, first, by way of introduction, the key statutes here at issue are Sections 1203 and 1212 of Title 10. Uh, broadly speaking, these are, uh, statutes that allow for disability severance payments to, uh, service members who are separated from service as a result of a disability. Uh, disability severance payments are calculated by a service member's monthly basic pay multiplied by his number of years of service subject to a statutory floor of three years. In the event that a service member is, uh, suffers an injury, however, in certain specified circumstances, uh, he is entitled, uh, to enhanced disability severance payments. And that's the key provision that we're disputing here today. Mr. Kyle Gramling, uh, was a, a service member who was disabled in a training exercise. Uh, and, uh, he, unfortunately, after two weeks at, at Airborne School on his second jump, uh, he had a bad parachute landing fall and injured his ankle. This required, ultimately, separation from service. Uh, he, we do not question that Mr. Gramling is entitled to a disability severance payment. We only, uh, question whether he is, uh, entitled to, uh, the enhanced disability severance, uh, as, uh, noted in Section 1212. Uh, the enhanced disability severance payments are reserved for those who are injured in the line of duty in a combat zone or, uh, for those who suffer their injuries, uh, during the performance of duties in combat-related operations as designated by the Secretary of, uh, of Defense. The Secretary of Defense has promulgated, uh, an, uh, a, a directive-type memorandum that, uh, that defines that term to mean injuries as a direct result of armed conflict. Uh, Mr. Gramling's injuries do not qualify, uh, uh, under that provision. Now, Mr. Gramling has waived the right to seek these enhanced disability severance payments. He, he really didn't waive it, did he? I mean, nobody could go against the DTM. Why does he have to raise it when he knows, uh, that he's gonna lose? It's an obvious, uh, instance where we should look at the futility doctrine, right? Uh, it, it raises a futility doctrine issue. However, the case law does make, make clear, uh, Mr. Gramling does not have to win at the Physical Evaluation Board in order to be, uh, required to raise an issue to the attention of the Army. So, the key, uh, inquiry for the purposes of, uh, waiver... But the PEB has to follow the, the, uh, DTM and the applicable, applicable regulations. That, that is absolutely correct, Your Honor. However... So why, why do we have to skip through all these, uh, procedural hoops? Because it is not the case that Mr. Gramling would be without recourse or even without remedy at the level of the Army. Uh, the PEB is not the only, uh, agency body, uh, that, uh, that, that can rule, decide upon, implement, uh, regulations. As, uh, well, there, there are two entities to consider here. The first is the Secretary of Defense himself. The only thing that is required under the Metz case and the Gantt case, uh, for the purposes of, uh, of seeking remedy before the courts is to, uh, to give notice to the agency. So the agency can deal with the, the problem first. Uh, so the agency can, can build a proper record so the court would have something to decide. But part of that inquiry is to allow the agency to take, uh, action, to, to wash its own dirty laundry, as it were. Uh, and the Secretary of Defense has wide discretion to, uh, implement its rules and, and indeed to change its rules as required. Uh, the, the place for, uh, a, a figure such as Mr. Gramling to raise, uh, uh, an issue regarding the unfairness of a regulation, the, the invalidity of a regulation would be at the physical evaluation board level. At that point, it's up to the agency to take action, whether to implement the, the, uh, excuse me, to, uh, to apply the regulation directly, um, or alternatively to change it, to change regulation as required. There is another agency body that can act as well. This was not... How would you get around the Bethesda Hospital case at the Supreme Court? The Bethesda Hospital case, uh, just to jog my own memory, uh, I believe had to do with financial intermediaries. Uh, that was the, um... The HHS, yeah. Yes. Uh, there were third-party financial, uh, intermediaries. Uh, these third-party, uh, intermediaries, um, were the sole adjudicative, uh, entity in between, uh, that, that, that, uh, had to rule upon the petitioner's, uh, claims. Uh, here, uh, the, the, it's not merely the PEB that can take action on behalf of the agency. The Secretary of Defense can take action on behalf of the, the agency. The Secretary of Defense can countermand his own regulations or choose not to apply his own regulations. The other, um, distinguishing factor is that, um, while the PEB may be, uh, constrained as to the implementation, uh, and, and the application of the DTM, uh, the... Excuse me. The correction board, the, uh... Uh, the ABCMR, the, uh, the Army Board for Correction of Military Records, uh, does have broad discretion also, uh, to rule, uh, in... to rule with respect to, uh, the application of regulations. It sits, uh, both in law and in equity, uh, and it can, uh, in the case of manifest injustice, uh, simply allow for, uh, Mr. Groundling to have certain benefits that, uh, the strict application of rule may not. So, um, in the, the Bethesda Hospital, uh, situation did not allow third-party intermediary, uh, adjudicative entities, uh, you know, such discretion. And in this case, you know, there is such discretion. Um, so, uh, going back to the remainder of the waiver issues, Mr. Groundling had numerous opportunities to raise his complaints regarding the, uh, his entitlement to enhanced disability severance payments to the Army Boards. Uh, the, uh, informal P.E.B. issued its initial report regarding Mr. Groundling's, uh, disability rating, its recommendation for separation, uh, his limit... his ankle injury and, uh, his entitlement to enhanced disability severance payments on July 25th, 2008. Following that, Mr. Groundling had the opportunity to, uh, submit rebuttal evidence, had the opportunity to, uh, appear before a formal P.E.B. hearing, which he did on September 3rd, 2008. Uh, he also had the, uh, the opportunity to submit rebuttal evidence once again, evidence, uh, following the formal P.E.B., which Mr. Groundling did. Uh, and finally, Mr. Groundling had the opportunity to go before the, uh, Army Bo... uh, ABCMR, Army Board Military, uh, Correction... ABC... uh, Correction of Military Records, excuse me. Uh, at every one of these stages, Mr. Groundling took advantage of the opportunity to challenge, uh, the disability rating and to challenge the findings regarding, uh, his ankle. However, Mr. Groundling chose not to dispute the circumstances around his injury, which is to say that he incurred his injury outside of the performance of duties in combat-related operations. He accepted that finding. He did not challenge it before the board. He did not give the Army, uh, the opportunity to, uh, to... to address that issue. The only arguments that Mr. Groundling raises to respond to that are futility, as we just addressed, uh, and the fact that Mr. Groundling did not have an attorney present. Uh, we note that, uh, the Gantt case, uh, in the Gantt case that is cited, uh, in the government's brief, uh, there was no attorney present, uh, in that matter as well. Um, Mr. Groundling had, just as the... the Gantt, uh, appellant had, a, uh, service organization representative, uh, someone who is, uh, trained and certified, uh, to assist veterans with the benefits process. Uh, Mr. Groundling, uh, had assistance with him. He actively chose this representative. Army Regulation 635-40, paragraph 420d1 gives Mr. Groundling the right to choose his representative, uh, at these, uh, physical evaluation board proceedings. Mr. Groundling chose a service organization representative over a legal counsel, uh, so he is not now, uh, free to, uh, complain about the quality of his counsel. We note two other, uh, things. Mr. Groundling never does say that he had ineffective assistance of counsel. That's, uh, an important point. He did have, uh, assistance with him at the board level. Uh, he chose, however, uh, not to raise this argument, uh, and is therefore, uh, waived. Uh, moving onward to the second major, uh, issue that, uh, Mr. Groundling raises, uh, as, uh, as we note in our briefs, Mr. Groundling is simply not entitled to the enhanced disability severance payments, uh, under Section 1212, uh, and under the March 12th, uh, directive type memorandum. Uh, the, the language of the statute is by itself fairly clear. Uh, it does say that these benefits are for, uh, injuries that are incurred during the performance of duties in combat-related operations. Uh, combat-related. Combat-related operations as designated by the Secretary of Defense. Combat-related, though, that's a pretty could be conceived as a pretty broad term, right? It could be. We would concede that it could be broad. However, uh, in this particular case, Congress had, uh, designated its definition to the, uh, the Secretary of Defense, uh, and, you know, we would know. Uh, combat-related operations could be broad, but surely it, uh, it does not encompass every training-related exercise, every injury and basic training that somebody, you know, may incur. Uh, and, and, uh, for those individuals, there are some disability severance payments available. That would be the, the, uh, the severance payments for everyone else. Uh, the 1212C payments, uh, calculated by a three-year statutory floor as opposed to a six-year statutory floor. Um, to address the, the, the remaining, uh, issues raised by Mr. Gramling, uh, Mr. Gramling suggests that, uh, that the March 13 DTM should be, uh, ignored or at least should be treated as either invalid or inconsistent with congressional intent. Uh, we note a couple of things. First, that, uh, the, the congressional intent argument was not raised at the Court of Federal Claims level, and so therefore, uh, it is waived for the purposes of the Federal Circuit. Um, in any event, uh, the, the, the, the plain language of Section 1212 is not inconsistent with the language of the March 13 Directive Type Memorandum. Uh, we don't see this, and we, we don't see a narrowing of a broad statutory term, uh, to be, uh, an inconsistency. Uh, in, in fact, that is precisely the, the, the role that the Secretary of Defense, uh, was given. Um, in order to create a conflict, uh, Mr. Gramling, uh, asks this Court to look at congressional intent, uh, and that's an improper use of congressional intent. We point to the Waddell case that's cited in our, in our briefs with respect to that issue. Uh, as the Court noted, uh, the evidence of congressional intent was not included, uh, in this administrative record. The only, uh, evidence that was included was a single floor statement, which under the Garcia case does not represent the congressional intent, nor does a letter signed by a certain member of Congress, uh, post-dating, uh, statute. Uh, the only proper evidence of congressional intent should be a committee, formal committee report, uh, that's in the Garcia case, uh, and, and that was not, uh, part of the administrative record. Finally, uh, Mr. Gramling suggests that the, uh, March 13 directive type memorandum that defines the 1212, uh, standard, uh, is inconsistent with, uh, other statutes. Uh, under the Rosello case, uh, we should not be looking at unrelated statutes for the purposes of defining terms, uh, in, uh, section 1212. Uh, we note also all of the statutes listed by Mr. Gramling, uh, in his briefs, uh, are distinguishable from, uh, for another reason. Each and every one of those statutes includes, uh, a statutory definition for the, the term to be used, whereas in section 1212, the statute, the definition is left to the discretion of the Secretary of Defense. So, uh, under, uh, 26 U.S.C. 104, 5 U.S.C. 6303, 10 U.S.C. 1074I, and 10 U.S.C. 1413A, Congress has, uh, indicated that, uh, someone injured as a result of an instrumentality of war, uh, is entitled to certain benefits. With respect to section 1212, Congress has said it is up to the Secretary of Defense to determine who is, uh, injured, um, and must be separated, um, as a result of an injury during the performance of combat-related operations. So it's, uh, it is, uh, distinguishable for that reason as well. I see my, my time is, is quickly expiring, so I'd like to briefly conclude. If I might, uh, I will note the, as a, as a concluding matter that what we have here is, is an instance of a, of a, of a soldier, a brave soldier, uh, who sought to serve his country, and he, and he, uh, volunteered and enlisted, uh, for service. Uh, he was unfortunately injured in training. Uh, he was compensated, however, for this injury. Uh, he did receive a disability severance payment under Section 1212. Uh, the only thing that's at issue is whether Mr. Gramling is entitled to enhanced disability severance payments, and it's that position that, uh, the government disputes. Uh, the Court's decision below should be affirmed. Thank you. Thank you, Mr. Yates. Mr. Bullock, you have, uh, two minutes, two minutes remaining. Thank you, Your Honor. Um, first of all, um, the, with regard to the question of waiver, the number, the cases that the government, uh, cites, uh, these are not cases in which the underlying regulation is being challenged. If you look, let's take a look at the practical impact of what the government is suggesting. Uh, the informal PEB and the formal PEB are the same board. So, as a practical matter, there can't be an appeal from the same board to the same board. Um, the APDA, uh, was merely forwarding of the records from the PEB to that particular board. Um, there's nothing in any of the documents that would alert Mr. Gramling to the fact that he needed to challenge the validity of a regulation, uh, at that particular stage. Um, with regards to the issue about counsel, the, the Court of Federal Claims opinion merely states that Mr. Gramling had counsel and we want to clarify, uh, that that was not legal counsel. So, uh, to fit the record. With regard to the issue about inconsistency, and, uh, I would acknowledge that that was not raised below. That was an error on our part to have included it in the brief. Um, I would note for the record that this court has the ability to consider that issue to avoid manifest injustice and we would request that the court do that. With, with regards to the question that both Judge Land and Judge Rader asked about where was the inconsistency, if you look at the form at Joint Appendix 159, it says in one part that the soldier's retirement and injury was a direct result of armed conflict or caused by instrumentality of war, while at the same time it was not caused by combat-related operations. And I would respectfully suggest to the court that Mr. Gramling was training for combat operations, uh, and accordingly, the way in which the Secretary wrote this particular regulation was arbitrary and capricious. Thank you. Thank you, Mr. Bullock. Our next case is N. Ray Caul.